### INTERSTATE ELECTRIC CO. et al. v. DANIEL.

### 6 Div. 340.

Supreme Court of Alabama.

Nov. 9, 1933.

Rehearing Denied Dec. 21, 1933.

London, Yancey & Brower and Jim C. Smith, all of Birmingham, for appellee.

Cabaniss & Johnston, of Birmingham, for appellants.

BROWN, Justice.

This is a joint appeal by the defendants from a judgment entered on the verdict of a jury awarding the plaintiff $50,000 as damages for the publication of alleged libelous matters in a proof of loss filed by the appellant Interstate Electric Company with the Fidelity & Deposit Company of Maryland, under a bond through which said Fidelity & Deposit Company, for consideration, insured the fidelity of the plaintiff as secretary and treasurer of said Interstate Electric Company, after the amount of the award on the hearing of the motion for a new trial had been reduced by the court, with the consent of the plaintiff, to $10,000, and the motion overruled.

After the reduction of the award, the defendants renewed their motion for a new trial, and this was likewise overruled.

The defendant Stern, at the time of the filing of the proof of loss, was the president of the Interstate Electric Company, and Crow was its secretary and treasurer, succeeding the plaintiff in this position.

The case was submitted here on assignments of error in which all the appellants join without an order of the court allowing a severance, and under the uniform rulings, only assignments of error affecting all the appellants will be considered. Bank of Cottonwood et al. v. Hood (Ala. Sup.) 149 So. 676.

The proof of loss is in the following language:

"Fidelity & Deposit Company
of Maryland
Baltimore

"(Received Oct. 1, 1928, ——— Claim Department.)

"Proof of loss under Fidelity Bond.

"Interstate Electric Company presents claim for loss under Bond No. 2218701, issued on behalf of or covering Interstate Electric Company, of Birmingham, Alabama, from and after the 1st day of November, 1924, and in the amount of $25,000.00 employed in the position of Secretary-Treasurer at Birmingham, Alabama.

"Detailed Statement of Claim
"(Attach original vouchers.)

| Date | Description of Item | Amount | Total |
|---|---|---|---|
| From to-wit June 9th, 1926, to May 1, 1928 | Losses sustained by Interstate Electric Company between the dates, to-wit, June 9th, 1926, and May 1st, 1928, as a result of the larceny, and/or embezzlement, and/or theft, and/or forgery, and/or misappropriations, and/or wrongful abstraction, and/or willful misapplication, and/or other acts of fraud, and/or dishonesty committed by L. A. Daniel while Secretary-Treasurer of the said Interstate Electric Company— | | |
| | Total Loss.......... | $9,684.90 | |
| | Credits ............. | 0 | |
| | By salary or commission ............. | | |
| | Other credits (including securities, notes, offsets, etc.,) | 0 | |
| | Total credits.... | 0 | $9,684.90 |
| | Net Loss........ | | $9,684.90" |

And appended thereto is an affidavit made by Crow, as secretary and treasurer of the defendant corporation, to the effect, "that the above statement is true and correct in every respect and that the moneys listed therein were collected or received by the said L. A. Daniel on the dates and in the respective amounts shown, and that the proceeds of same and/or the proceeds of the goods at their cost value, as set forth in said statement, have not been paid over or satisfied in any way whatever to the said Interstate Electric Company, but have been misappropriated by the said L. A. Daniel to his own use and benefit with the intent to fraudulently deprive the said Interstate Electric Company of same," etc.

The defendants interposed the plea of the general issue with leave to give in evidence any matter, which, if specially pleaded, would be a defense.

The evidence shows that the defendant Interstate Electric Company, during the years 1926, 1927, and 1928, engaged in the business of selling electrical equipment and fixtures in the city of Birmingham; that the plaintiff, Daniel, was its secretary and treasurer, and had supervision and control of said business; that one Lawrence Newberger, who was a nominal vice president of the corporation and was at the head of one of the departments of said business, countersigned checks issued by said plaintiff, but that plaintiff was the person in charge—in the absence of the defendant Stern who was the president and who resided in the city of New Orleans, La.—and had authority to employ and discharge the employees of the corporation, supervise its books, control credit to its customers, and handle the moneys of the company. That to insure his fidelity in his said employment, plaintiff furnished to his employer a bond with the Fidelity & Deposit Company of Maryland as surety, insuring the employer against loss occurring while plaintiff was "performing the duties of his position, directly or by collusion with others, caused to the employer through any act of larceny, embezzlement, theft, forgery, misappropriation, wrongful abstraction, wilful misapplication, or any other act of fraud or dishonesty committed" by the plaintiff as such secretary and treasurer.

The evidence shows that the proof of loss was filed with the insurer by the defendant corporation on the advice of its attorney, after an investigation and full audit of the books of the corporation by its auditor, one Rasch, and the proof of loss was prepared by its said attorney based on information furnished by said Rasch, supplemented by a personal investigation by said attorney; was dictated to a stenographer in the attorney's office, transcribed on blanks furnished by the insurer in response to a request of the attorney accompanying preliminary notice of loss, and was delivered in the usual course of business to the insurer through the mails, and a copy thereof forwarded to the insurer's special agent at his request.

The evidence is without dispute, that in June, 1926, the plaintiff participated with one Whitehead in organizing and incorporating "The Electric Shop, Inc.," with authorized capital stock of $1,500, in Jefferson county; that one-half of the stock was subscribed for in the name of R. G. Daniel, plaintiff's son, who was just out of college, and who was without funds; that the other half was taken by Whitehead; that Whitehead paid for his stock by bills receivable and equipment; that it was agreed that Daniel "was to pay for his stock in the corporation by delivery of merchandise and fixtures to the corporation that would be useful and beneficial to the corporation in the business in which it was about to then engage"—the sale and installation of electrical equipment.

The evidence further shows that before participating in the organization of the Electric Shop the plaintiff consulted with Newberger; that merchandise was delivered from the place of business of the defendant Interstate Electric Company to said Electric Shop; that plaintiff and Newberger participated in the conduct of the business of said Electric Shop; that Newberger aided it in acquiring contracts; and that plaintiff advanced to it money to meet its obligations and collected money due it, some of which he deposited with "The Security Bank, North Birmingham" on account of "L. A. Daniel, Special."

The evidence further shows that the "Electric Shop, Inc.," for some months, was very active in the prosecution of the business of contracting for and installing electrical fixtures on various projects, and that it suffered losses; that when it became apparent that said business was not profitable, the plaintiff withdrew from the business, and the evidence further tended to show that merchandise furnished to said Electric Shop was charged on the books of the defendant corporation to Whitehead and other creditors of the Interstate Electric Company; and that said creditors denied their liability and refused to pay for merchandise so charged.

The plaintiff on cross-examination testified, inter alia, "It is true when The Electric Shop was incorporated on or about the 15th day of June, 1926, it was agreed my son was to pay for his stock in that corporation by delivery of merchandise and fixtures to the corporation that would be useful and beneficial to the corporation in the business in which it was then about to engage. It is not true that either me or my son turned into this corporation in payment of the stock taken out these fixtures that were moved over there. I don't know when it was those fixtures that

were taken over to The Electric Shop were brought back to the Interstate Electric Company, but I had them returned. They were on consignment and not to be paid for. I don't know just how long those fixtures remained in the place of business of The Electric Shop, or whether they were returned to the Interstate Electric Company before my son and Whitehead broke up. My son and Whitehead did break up. * * * Part of the reason for my son pulled (pulling) out of The Electric Shop was that Mr. Lawrence Newberger kept interfering with the business and insisting on it taking more jobs, which I had not agreed to do. My son pulled out of The Electric Shop the first of November, 1926, and after that time he had no further interest in The Electric Shop. I had an account carried in The Security Bank, North Birmingham, in the City of Birmingham, in the name of L. A. Daniel, Special. I don't remember whether I got the money on a check endorsed by me from Mackle-Shepherd, dated November 20, 1926, after my son pulled out of The Electric Shop and deposited it to the account of L. A. Daniel, Special. Without seeing the check I don't remember whether it is true I collected another one hundred dollars from Mackle-Shepherd on the 13th of November 1926, and deposited that to the credit of L. A. Daniel, Special, after my son was out of The Electric Shop. I could not tell just exactly how much money I handled through the account, L. A. Daniel, Special, but something like five thousand dollars. That money was not handled in the name of The Electric Shop, and it was not handled in the name of the Interstate Electric Company, *but that represented merchandise in each and every instance that had been sold to The Electric Shop, and on which I collected the money and deposited it in that account, the merchandise being bought from the Interstate Electric Company, and the merchandise went out of the place of business of the Interstate Electric Company in every instance.* I do not know how much money there is on the books of the Interstate Electric Company now due from The Electric Shop, debts created during the time my son was interested in The Electric Shop. When I left the Interstate Electric Company, it was true that it ran into many thousands of dollars. I couldn't tell you whether I have paid a nickel since I left the Interstate Electric Company, or whether The Electric Shop has paid a nickel since then. I have had nothing to do with it since then. I don't know whether Mr. Rasch or the Interstate Electric Company knew anything about that L. A. Daniel Special account in the Security Bank until after I left the Interstate Electric Company. I never did tell Mr. Rasch about it." (Italics supplied.)

On redirect examination the plaintiff testified: "With reference to this property that was carried over to The Electric Shop on con-signment, that was authorized by Mr. Lawrence Newberger. I held the order up when it was brought to me. I wouldn't okeh it. Mr. Newberger stated he had a new line of fixtures in the store and he had no place in Birmingham to display them where he could send customers to see that, new line, and he asked Whitehead to hand (handle) them in the place where he could send customers to see them, and they were placed there, not for sale, but for the interest of Lawrence Newberger, and later, when the place was closed up, they were brought back, and I suppose credited on the books. * * * At the time of the organization of The Electric Shop my son didn't put any property into that concern. I had agreed to take stock in it myself as soon as I got this money, provided the thing went on satisfactorily. At the time of the organization of The Electric Shop, Whitehead put up the money for the organization of that company. At the time of the organization of that company, my son was just out of school from Auburn, and he was going in there with Whitehead to learn the business."

■ The bond under which the proof of loss was filed was furnished by the plaintiff to indemnify and assure the defendant Interstate Electric Company from loss resulting from the acts of the plaintiff directly or through collusion with others, while in its employ as secretary and treasurer "through any act of larceny, embezzlement, theft, forgery, misappropriation, wrongful abstraction, wilful misapplication, or any other act of fraud or dishonesty." Craft v. Standard Acc. Ins. Co., 220 Ala. 6, 123 So. 271.

And in the light of the undisputed facts, the occasion for filing the proof of loss was one of qualified privilege. Kenney et al. v. Gurley, 208 Ala. 623, 95 So. 34, 26 A. L. R. 813, and note pages 832–835.

■ The alleged libelous statements in the proof of loss were material and pertinent to the right of the Interstate Electric Company under the bond, the persons who made them were acting as officers or agents of the defendant Interstate Electric Company and within the line and scope of their authority, and they were made to the person or persons to whom the provisions of the bond required them to be made, and, if made in good faith, believing that they were true, without actual or express malice, the communication was privileged, and the defendants are not liable. Kenney et al. v. Gurley, supra.

■ The question of whether or not the occasion is one of privilege, and whether or not the alleged libelous statements were pertinent and material to the rights involved, are ordinarily questions of law for the court. Kenney et al. v. Gurley, 208 Ala. 623, 95 So. 34, 26 A. L. R. 813; Parsons v. Age-Herald Pub. Co., 181 Ala. 439, 61 So. 345; Adam v. Ward, [1917] A. C. (Eng.) 309, Ann. Cas. 1917D, 249.

614

If the alleged libelous statements were made on a privileged occasion, and the statements were pertinent and material to the rights involved, they are prima facie without actual malice, and are privileged, and the burden is on the plaintiff to show malice in fact. Kenney et al. v. Gurley, supra; Age-Herald Pub. Co. v. Waterman, 202 Ala. 665, 81 So. 621; Massee v. Williams, 124 C. C. A. 492, 207 F. 222; Starkie on Slander and Libel, § 670; Townsend, Slander and Libel, 349, 350; Newell, Slander and Libel, 389.

Evidence going to show want of probable cause on the part of defendants to believe that the publication stated the truth, is admissible to show want of good faith and the existence of malice in fact, and countervailing evidence on the part of the defendants going to show the existence of probable cause is admissible to disprove malice; but, as a general rule, the existence of probable cause to believe the matters published are the truth does not constitute a defense to the malicious publication of a libel.

The exception to this rule is where the publication is made in a proceeding before a tribunal or body that has jurisdiction and authority, as between the parties, and for the purpose of which the proceeding is instituted, to determine the truth or falsity of the charge, the proceeding, where the charge is found to be false, partaking of the nature of a malicious prosecution. In such case the occasion is one of qualified privilege, and for the plaintiff to recover in an action of libel he has the burden of showing that the proceedings were malicious and without probable cause, and the existence of probable cause is a complete defense. Streety v. Wood, 15 Barb. (N. Y.) 105; Atlantic Coast Line R. Co. v. Ward, 92 Fla. 526, 109 So. 452.

In cases falling within the last stated category—the exception to the general rule—proof that the proceedings were instituted after a full and fair statement of all the facts within the knowledge of the defendant, and such as could be ascertained by due diligence on defendants' part, were submitted to a reputable practicing attorney, and that he advised the commencement of the proceeding, would no doubt sustain a plea of justification, as in cases for malicious prosecution. Marks & Co. v. Hastings, 101 Ala. 165, 13 So. 297.

The facts of this case, however, do not bring the case at bar within this exception, and neither the existence of probable cause nor the advice of a reputable attorney can justify the malicious publication of the alleged libel. Evidence going to show such facts was admissible as tending to rebut the existence of malice.

While we are of opinion that there was some evidence in the case tending to show that malice on the part of the defendants attended the publication of the alleged libel, we are clear to the conclusion that the great weight of the evidence is against the verdict, and that it should not be allowed to stand. There was not only much evidence going to show good faith in making the proof, and that defendants had probable cause to believe the charges were true, but there was much evidence tending to show that plaintiff, Whitehead, and Newberger were in collusion in forming and promoting the business of the corporation known as the Electric Shop, as a cloak and cover for the conversion of merchandise from the store of the Interstate Electric Company, to the use of said dummy corporation, of which they were the promoters, and tending strongly to establish the plea of truth.

It is conceded that plaintiff's son paid nothing for his stock, unless it was paid for by merchandise from the store of the Electric Shop, and it is conceded by plaintiff that he practically controlled said business as long as his son remained in it, and some of the goods delivered to said Electric Shop were charged to Whitehead individually after plaintiff withdrew his support of the business. It further appears that neither of the defendants had any knowledge of plaintiff's connection with the Electric Shop, until plaintiff's resignation as secretary and treasurer of the Interstate Electric Company.

We therefore hold that the court erred in refusing the defendants' motion for a new trial, and for this error the judgment is reversed. Kenney et al. v. Gurley, supra.

Inasmuch as the case must be retried, we deem it proper to observe that the conversation between the plaintiff and Mr. Rasch in reference to Stern's dissipations and habits in respect to liquor and women was wholly irrelevant and immaterial; it was, if the conversation took place, but the opinion or diagnosis of Rasch as to the situation, and not a repetition of the declarations of the defendant.

What occurred between plaintiff and Pritchard, as testified to by plaintiff and his wife, at Pritchard's office, occurred before the filing of the proof of loss, and was admissible on the question of malice.

Testimony that was injected into the case by the plaintiff as a witness about his physical condition at the time of the trial was not pertinent or material, yet it was calculated to engender sympathy and prejudice with the jury.

Reversed and remanded.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.