Andy WOODS, Plaintiff/Appellant,

v.

Hesham HELMI, M.D.A., Jorge Chaumont, M.D.A., Defendants,

and

Michael Stephen Dunlap, C.R.N.A., Defendant/Appellee.

Court of Appeals of Tennessee, Western Section, at Jackson.

May 24, 1988.

Application for Permission to Appeal Denied by Supreme Court, Aug. 22, 1988.

220

David A. Siegel, Memphis, for plaintiff/appellant.

David P. Jaqua, S. Russell Headrick and Teresa J. Sigmon, Armstrong, Allen, Prewitt, Gentry, Johnston & Holmes, Memphis, for defendant/appellee Dunlap.

TOMLIN, Presiding Judge (Western Section).

Ms. Andy Woods (hereafter "plaintiff") brought suit in the Circuit Court of Shelby County against Michael Stephen Dunlap (hereafter "defendant" or "Dunlap") and others, seeking damages for alleged defamation of character by libel and wrongful interference with employment and/or contract. The trial court granted defendants' motion for summary judgment, holding that for the purposes of both claims by plaintiff no publication had occurred. This order was made final pursuant to Rule 54.02, T.R.C.P. The issue presented by this appeal is whether the trial court erred in granting summary judgment concerning both claims. We agree with the trial court and affirm.

At all times pertinent to the incident sued upon plaintiff was employed at the Regional Medical Center in Memphis, hereafter referred to as "The Med," as a Certified Registered Nurse Anesthetist ("C.R.N.A."). The Med, formerly known as the City of Memphis Hospital, was operated by the Shelby County Health Care Corporation (hereafter "S.C.H.C.C."), a private not-for-profit corporation. As a term and condition of this lease S.C.H.C.C. entered into a contract with the University of Tennessee ("U.T.") and the Faculty Medical Practice Corporation ("F.M.P.C.") whereby U.T. would continue graduate medical and dental education at The Med. U.T. agreed to provide The Med with a house staff of medical and dental interns and residents. U.T. also agreed to provide medical and dental faculty to instruct and supervise the interns and residents and to perform other medical-administrative services. F.M.P.C. agreed to provide the necessary attending, consultative and other direct physician services for all patients of The Med that required such services. Both U.T. and FMPC were compensated in accordance with schedules contained in the contract. In May, 1985, a new entity known as the University Physicians Foundation, Inc. (herein "U.P.F.") became the successor corporation to F.M.P.C.

Plaintiff's immediate superior was Dunlap, who held the title of Lead Clinical C.R.N.A. In the chain of command Dunlap reported to Robert Boyles, Vice President of Professional Services at The Med. Both defendant Dunlap and Boyles were employees of The Med.

At all times pertinent to the incident in question Dr. Rajkumar Stephens was the Acting Director of the Anesthesia Department at The Med. His superior was Dr. John Angel, Chairman of the University of Tennessee Department of Anesthesiology, who appointed Dr. Stephens to his post at The Med. Both Stephens and Angel were members of U.P.F.

The job description of a C.R.N.A. employed at The Med under the Department of Anesthesiology read in part as follows:

The privileges of personnel in this position must be approved by the Credentials Committee of the Medical Staff after approval by the Director of Anesthesiology, THE MED, and the Chairman of the Department of Anesthesiology.

The Certified Registered Nurse Anesthetist's (CRNA) performance shall be under to [sic] overall direction of the Director of Anesthesia Services or his qualified anesthetist designee.

Prior to the incident that led to the dismissal of plaintiff, she had occasion to work in the operating room with the other two defendants in the original suit, Drs. Helmi and Chaumont, both staff anesthesiologists at The Med. As a result of an incident involving a patient that occurred in July, 1985, Drs. Helmi and Chaumont submitted reports to Dr. Stephens, with copies to Drs. Angel and Dunlap. As a result, plaintiff was suspended without pay for four days and placed on six-months probation. The probation letter was written by Boyles.

As a result of an incident that occurred on November 27, 1985, Dr. Helmi sent another report to Dr. Stephens, with copies to Dr. Angel and defendant Dunlap.

Boyle's affidavit stated that following the November 27, 1985 incident, he discussed plaintiff's performance with her superior, Dunlap. He was instructed by Boyles to prepare a clinical evaluation of plaintiff's conduct based upon the assumption that the facts in Helmi's report were true. Boyles stated that this clinical evaluation by defendant was requested pursuant to the policies and procedures then in effect in the Department of Anesthesia at The Med. Dunlap submitted the evaluation on December 11, 1985. The original memorandum was sent to Boyles, with copies to Drs. Stephens and Angel as well as to Mitch Spurlock, the Director of Employee Relations at The Med. In defendant's memorandum to Boyles he critiqued plaintiff's conduct and concluded that there were two violations represented therein that were inconsistent with The Med's anesthesia policy procedure. Plaintiff was terminated at The Med some eight days later. Defendant Dunlap's report was written on Med letterhead, with the legend "Regional Medical Center at Memphis" printed at the bottom of the page.

Dr. Helmi's report to Dr. Stephens reported that plaintiff had administered insulin to a patient without consultation and without subsequent glucose administration. Helmi's report further stated that plaintiff had failed to record the patient's vital signs for a period of fifteen minutes.

## I. THE LIBEL CLAIM.

In granting summary judgment on this issue, the trial court stated in part as follows:

Specifically, the court is of the opinion that there was no publication of the allegedly defamatory information. The record reveals that defendant Dunlap was Lead CRNA in the anesthesiology department at The Regional Medical Center at Memphis ("The Med"), and his allegedly defamatory memorandum concerned plaintiff's performance as a CRNA at The Med. Recipients of the communication were Mr. Boyles, an assistant vice-president at The Med with managerial oversight of this department; Mr. Spurlock, The Med's Director of Employee Relations; Dr. Raj Stephens, Acting Director of The Med's Department of Anesthesiology and a member of the

University of Tennessee Department of Anesthesiology; and Dr. John Angel, Chairman of the University of Tennessee Department of Anesthesiology which staffed and operated The Med's anesthesiology department and one of the persons to whom Dr. Stephens was responsible. All of these persons had managerial, supervisory or administrative responsibilities and oversight for these internal affairs of The Med's anesthesiology department and were immediately interested in the information transmitted. The court concludes that the basic principle of *Freeman v. Dayton Scale,* [159 Tenn. 413] 19 S.W.2d 255 (Tenn.1929), and its progeny relied upon by Dunlap applies to this case, and the fact that the physician recipients of the information were also faculty members or employed by the University of Tennessee and/or University Physicians Foundation is of no legal consequence.

For similar reasons, the court finds that the motion should be granted on the count for interference with plaintiff's business advantage or contract of employment.

Plaintiff admits that defendant was her immediate superior at The Med. She likewise concedes that all those who received the memo were in the chain of command and were entitled to receive it. This concession was made by plaintiff's counsel as well:

MR. SIEGEL: Your Honor, I would simply say that I know of no decision in this state, that has held that a publication does not occur when dealing with officers and agents of separate corporations, which is what we have in this case.

THE COURT: Counselor, wasn't it necessary for these people to see this, concerning the qualifications and ability of this individual? Aren't they the very people that had to receive this communication.

MR. SIEGEL: Yes, sir. That is correct. However, in the case of Southern Ice versus Black, that issue was addressed, and the court said that there was—there was no publication other than to those immediately interested in the transaction. What I'm saying, Your Honor, is that the Tennessee courts have not gone as far as to hold no publication simply because the two parties are interested in the transaction or, for that matter, even have a duty in the transaction.

The fact of the matter is Ms. Dunavan [sic] cited in her affidavit which was filed last week a contract between the Shelby County Health Care Corporation of the University of Tennessee and the Faculty Medical Practice Corporation. Now, her affidavit neglected to mention a contract amendment which also exists, which I have provided pursuant no [sic] my affidavit, which I feel highlights the fact that the Shelby County Health Care Corporation of the University of Tennessee and UPF are, in fact, separate entities. If I might cite section seven of the original contract.

THE COURT: But, Counselor, are we debating semantics? I mean, this communication according to this file went to the very people who it was required to go to concerning the qualifications of any doctor or CRNA or nurse or anyone else who was performing services out there at that hospital and taking care of patients. Whether the communication is right or wrong, this communication went to the very people that that was required to go to; was it not?

MR. SIEGEL: Your Honor, there is no doubt about that. I don't even dispute that.

Plaintiff contends that the trial court mistakenly confused the concept of "no publication" with that of "privilege." We respectfully disagree with this contention. While it is true that a split of authority exists among the various jurisdictions concerning whether a publication is had under these circumstances or whether circumstances such as these present a qualified privilege, Tennessee for many years has been aligned with what we believe to be the majority view, that there was no publication under the facts herein presented. It is an elementary rule in this state that publication is an essential element of a libel action without which a complaint must be

dismissed. *Applewhite v. Memphis State University*, 495 S.W.2d 190 (Tenn.1973); *Freeman v. Dayton Scale Co.*, 159 Tenn. 413, 19 S.W.2d 255 (1929). *Freeman* and its progeny have committed this state to the proposition that inasmuch as the gravamen of the act of libel is pecuniary damage to the character or credit of the party libeled, a libel cannot arise without publication. Furthermore, we do not reach the matter of privilege, malice or any other question until there is a publication.

In *Freeman*, the plaintiff brought suit for slander by an agent of the defendant corporation as a result of a letter dictated by his agent to his secretary, and for libel based upon the content of the letter itself. Plaintiff was involved in a controversy with the defendant corporation which had corresponded with plaintiff's attorney subsequent to the filing of a lawsuit. The Supreme Court held that a communication of a defamatory matter between the agents and officers of a corporation in the ordinary course of business was not a publication. It further held that the communication of defamatory matters to a person selected by the plaintiff that might be discussed between parties to a controversy also did not amount to a publication. The *Freeman* court quoted with approval the following from an annotation in 18 ALR 772, 778: "[T]he more liberal rule, and the one which seemingly has the support of the weight of modern authority, is that, where the communication is made to a servant or business associate in the ordinary and natural course of business, there is no actionable libel." *Freeman v. Dayton Scale Co., supra*, at 257.

While many of the cases denying the existence of a publication speak in terms of corporations communicating to or with itself, it seems to this Court that more essential to the issue is the concept of "need to know," with the communication flowing through the proper chain of command, particularly in employee performance reviews or disciplinary action. It could readily be argued that the concept of intra-corporate communications would not apply if, in the case of a review by corporate superiors of the alleged misconduct of a branch manager, the circumstances surrounding his misconduct were communicated also to the corporation's truck driver or janitor, who obviously would not be in the "need to know" pipeline.

Plaintiff acknowledges in her brief that the ruling in *Freeman* has been followed in at least two recent unreported decisions by both the Middle and Eastern Sections of this Court. She further acknowledges that in this state it is "now clear that the term 'others' does not include officers and agents of a single corporation who receive defamatory matter emanating from other agents within that same corporation."

■ We interpret *Freeman* and its progeny to mean that communication among agents of the same corporation made within the scope and course of their employment relative to duties performed for that corporation are not to be considered as statements communicated or publicized to third persons.

Counsel for plaintiff points out in his brief that every Tennessee case dealing with this subject has involved communications between employees of the same corporation. This is true. In the case at bar there is a factual difference that distinguishes it from *Freeman*—the memorandum in question was disseminated between employees of two different corporate entities. Dunlap (The Med) addressed and delivered the memo to Boyles (The Med), sending copies to Dr. Stephens (U.P.F.) and Dr. Angel (U.P.F.). This factual difference is not disputed.

Nonetheless, for the reasons stated hereafter, this Court is of the opinion that it should not reach a different result from that in *Freeman*. The lease between Shelby County and S.C.H.C.C. was contingent upon S.C.H.C.C. and U.T. and F.M.P.C. (U.P.F.'s predecessor) entering into a satisfactory contract for the provision of physicians and medical services. S.C.H.C.C. did in fact enter into such a contract pursuant to which F.M.P.C. (U.P.F.) agreed to provide "necessary attending, consultative and other direct physician services for all patients of The Med." [1]

As an accredited hospital, The Med was required to have a physician member of the medical staff direct the Department of Anesthesia. Dr. Stephens held this post on December 11, 1985. Rules and regulations of the Tennessee Department of Health and Environment required anesthesia to be administered by a physician or a C.R.N.A. under the supervision of the operating physician.

The Policy and Procedures Manual of the Department of Anesthesiology in effect at The Med in 1985 provided that the Chairman of the Department of Anesthesiology (Dr. Angel) had overall administrative responsibility for the Department of Anesthesia at The Med. The manual also provided that he could appoint a Director of the Anesthesia Department (Dr. Stephens) for the daily administration and supervision of this department. The same manual provided that the staff anesthesiologist was ultimately responsible for the direction of C.R.N.A.'s at The Med.

Because of a combination of rules and state law, The Med could not practice medicine but was required to maintain the necessary medical services by contract. For the same reason The Med was compelled to leave the responsibility for supervising the delivery of anesthesia by The Med's C.R.N.A.'s to the staff anesthesiologist. It thus becomes obvious that the medical staff had both an interest in and responsibility for the performance of the C.R.N.A.'s under their supervision. It was both a practical and legal necessity that they not only report any questionable practices by a C.R.N.A. but be advised about same as well.

The failure to operate the Department of Anesthesia at The Med in a safe, proper manner would involve serious consequences, from severe personal injury to perhaps death. The free and uninhibited flow of information by and between the officers, agents and employees responsible for the operation of the Anesthesia Department and The Med in general was mandatory. The performance of employees such as C.R.N.A.'s would need to be under observation at all times, and any real or suspected deviation from the appropriate standard of care should necessarily be documented and reported to those in authority. This proper exchange of information should not be inhibited by the technical nicety that a person or persons who were in the "need to know" channel were employed by different corporate entities. The responsibilities and duties of the particular parties involved take precedent over the corporate entity that pays them their salaries. We consider this a distinction without a difference insofar as applying the *Freeman* rule.

Having concluded that there was no publication and therefore no defamation, this Court is tempted to pretermit the other arguments as to this issue. However, we feel constrained to consider the results, assuming there was a publication. Plaintiff concedes that the memo in question was published unde a qualified privilege, sometimes referred to as a conditional privilege. Where a communication is conditionally privileged, it is free from the legal imputation of malice and is actionable only if there is actual malice. *O'Barr v. Feist,* 292 Ala. 440, 296 So.2d 152 (1974). The burden is on the plaintiff to prove actual malice. *Interstate Electric Co. v. Daniel,* 227 Ala. 609, 151 So. 463 (1933).

While this Court might be reluctant to dispose of the issue of actual malice by summary judgment, where no proof of malice is offered at all summary judgment would seem appropriate. Plaintiff offered no evidence whatsoever of actual malice on the part of Dunlap in preparing and publishing his December 11, 1985 memorandum. That being the case, summary judgment for Dunlap should be affirmed on this basis as well.

## II. THE CLAIM FOR INTERFERENCE WITH EMPLOYMENT.

By an amendment to her complaint plaintiff alleged that defendant Dunlap, along with others, unlawfully interfered with her employment, resulting in her discharge. This state recognizes both a common law and a statutory action for inducement to breach a contract. T.C.A. § 47–50–109 is declaratory of the common law except as to the amount of damages to

which a plaintiff might be entitled. See *Emmco Insurance Co. v. Beacon Mutual Indemnity Co.*, 204 Tenn. 540, 322 S.W.2d 226, 231 (1959).

After reviewing this record, while our reasoning may be somewhat different from that of the trial court, we are of the opinion that the trial judge did not err in granting defendant Dunlap's motion for summary judgment as to this claim as well. First, plaintiff concedes that Dunlap was her immediate superior, and that the persons to whom his memo was written had a right to receive the memo. Furthermore, in his affidavit in support of his summary judgment motion defendant stated that the memo was written at the request of his superior and that it was done in the course of his employment. This was in no way controverted by plaintiff. In *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758 (Tenn.1977), plaintiff sued the defendant Graves for procuring the breach of her employment contract, alleging that Graves induced the corporation to terminate her employment. In holding that the complaint of plaintiff was sufficient to set forth a claim against Graves, the Supreme Court noted that her allegation that Graves was "a supervisor" employed by Roane Hosiery would not serve to defeat her claim.

The Court noted that "[i]t is possible that Graves would not be liable for procuring the dismissal of the plaintiff if that action was within the scope of his duties at Roane. *See, e.g., Lyon Ford, Inc. v. Ford Marketing Corp.*, 337 F.Supp. 691 (E.D.N.Y.1971); Annot., 26 A.L.R.2d 1227, 1267 (citing cases). However, at no point in her pleadings does the plaintiff admit that Graves' acts were within the scope of his duties." *Id.* at 760. *Lyon Ford,* cited above, stands for the proposition that a company agent or employee cannot be held liable for inducing the breach of a contract of employment unless it be shown that he was acting contrary to the corporation. It is uncontradicted that defendant Dunlap was acting at all times within the scope of his employment at The Med and as plaintiff's immediate supervisor.

■ There is yet another ground for affirming the trial court on this issue. One of the requirements in recovering for interference in the performance of a contract is proof of malice on the part of the one charged. In his affidavit Dunlap makes oath that the memo was written in good faith and without any malice. Furthermore, as has been stated in connection with the previous issue, plaintiff presented not a scintilla of evidence of the existence of malice on the part of defendant Dunlap.

For the foregoing reasons, the judgment of the trial court is affirmed. Costs in this cost are taxed to the plaintiff, for which execution may issue if necessary.

HIGHERS and FARMER, JJ., concur.