Richard R. KOCH, Plaintiff–Appellant,

v.

LOCAL 438, UNITED AUTOWORKERS UNION, James Blaine and Rosemarie Patterson, Defendants–Appellees.

No. 00–6200.

United States Court of Appeals, Sixth Circuit.

Feb. 12, 2002.

Before KEITH, NORRIS and MOORE, Circuit Judges.

## OPINION

PER CURIAM.

Plaintiff Richard R. Koch appeals the district court's grant of summary judgment to defendants Local 438, United Autoworkers Union ("UAW 438"), James Blaine, and Rosemarie Patterson. Plaintiff filed suit, based upon diversity of citizenship, for defamation allegedly arising out of statements made in two letters concerning plaintiff's actions when he resigned from his position with UAW 438. The district court granted the defendants' motion for summary judgment on the grounds that it lacked personal jurisdiction over defendants Blaine and Patterson and that plaintiff had failed to allege facts sufficient to show publication of the alleged defamatory statements, a required element under Tennessee law.

### I.

Plaintiff is a former member and officer of defendant UAW 438 which represents the employees of General Motor's Delco plant in Oak Creek, Wisconsin. In 1987 plaintiff was appointed as the Health & Safety Representative for UAW 438 by the International UAW on the recommendation of UAW 438 officials, including defendant James Blaine, UAW 438 Shop Chairman. In 1997, plaintiff resigned his position with UAW 438 in order to transfer to a job with GM's Saturn Corporation in Spring Hill, Tennessee.

When defendant Rosemarie Patterson replaced plaintiff as Health & Safety Representative, she discovered several problems with plaintiff's stewardship of the office, including missing training manuals, a reformatted hard drive and general disarray. At the request of Blaine and Robert Peter, President of UAW 438, Patterson conducted an inventory of the plaintiff's office and wrote a letter ("Patterson letter") to the executive board of UAW 438 detailing the problems she found and also complaining that plaintiff was generally uncooperative in assisting her with the transition.

After a meeting of the executive board where Blaine described plaintiff's alleged

misconduct and advised the board that a letter from Patterson detailing the problems would be forthcoming, the board directed its recording secretary, Sheila Cochran, to compose and send a letter to officials in the UAW's international office advising them of this complaint. This letter ("Shoemaker letter") was addressed to Richard Shoemaker, Vice–President of the International UAW/GM Department. Copies of the letter were also sent to several other officials of UAW International and two officials of UAW Local 1853 ("1853"), the union representing employees at the Saturn plant where plaintiff then worked.

In April 1998, plaintiff applied for an Ergonomic Technician position at the Saturn facility. He was interviewed by Jerry Combs, a Saturn management representative, and Jerry Gravens, a UAW 1853 representative. Although plaintiff was recommended for the position, he did not receive it. Afterwards, Cravens informed plaintiff of the existence of the Shoemaker letter and advised him that he should look into the situation with UAW 438. After unsuccessfully attempting to get UAW 438 to retract the letter, plaintiff filed an unfair labor practice charge with the National Labor Relations Board (NLRB) in December 1998. His complaint was denied by the NLRB Regional Director, and plaintiff appealed. The NLRB rejected the appeal and plaintiff filed the present lawsuit alleging common law defamation under Tennessee law. He did not pursue his NLRA claim.

## II.

■ We review the district court's grant of summary judgment de novo. *DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir.1999). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### A. Personal Jurisdiction

Plaintiff's first claim is that the district court erred in determining that it lacked personal jurisdiction over defendants Blaine and Patterson. In determining whether personal jurisdiction exists over a defendant in a diversity action we normally apply a two-step analysis. First, we apply the relevant long-arm statute of the state where the suit was filed to see if it permits jurisdiction, and then we apply the Due Process Clause of the Fourteenth Amendment to determine if exercise of personal jurisdiction is constitutional. *See Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir.2000). In this case we look only to the second step, since the Tennessee Supreme Court has interpreted its long-arm statute to extend to the full extent permitted by the Due Process Clause. *See Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn.1985).

Under the Due Process Clause, personal jurisdiction arises where there are "minimum contacts such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1116 (6th Cir.1994) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Personal jurisdiction can be either general or specific depending upon the kind of contacts that exist. *Id.*

We have established a three-part test for determining whether specific personal jurisdiction exists:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a conse-

quence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968). The district court adopted the report and recommendation of the magistrate judge who applied this test and concluded, "The most that can reasonably argued is that Defendants might have foreseen the consequences of their actions which resulted in the forum state since no activities by Defendants Patterson and Blaine were purposefully directed towards Tennessee." We agree that personal jurisdiction does not exist for Patterson under this test and therefore affirm the district court's grant of summary judgment with respect to her on this ground. However, for the reasons discussed below, we conclude that the district court did have personal jurisdiction over Blaine.

### 1. Contacts of defendant Patterson

The only contacts that plaintiff identifies for Patterson are the several phone calls she made to plaintiff in Tennessee concerning her transition into his former position, and the fact that it was foreseeable that her letter to the executive board of UAW 438 would cause harm to plaintiff in Tennessee. Patterson's phone calls to Tennessee would not in themselves be sufficient because "[t]he use of interstate facilities such as the telephone and mail is a secondary or ancillary factor and cannot alone provide the minimum contacts required by due process." *Reynolds*, 23 F.3d at 1119 (quoting *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir.1988)) (internal quotations omitted). Therefore, the negative consequences suf-

fered by plaintiff in Tennessee as a result of Patterson's letter are the primary basis of plaintiff's personal jurisdiction argument for Patterson.

Although he fails to cite it directly, plaintiff apparently relies on the "effects test" under which personal jurisdiction exists where an individual purposefully directs activities towards the forum state with the intent to cause harm there. The Supreme Court first articulated this test in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), where it held that personal jurisdiction existed in California over two Florida residents because they were "primary participants in an alleged wrongdoing intentionally directed at a California resident...." 465 U.S. at 790, 104 S.Ct. 1482. The defendants in *Calder* had published an article concerning the plaintiff's activities in California in the National Enquirer allegedly libeling him. The Court concluded that personal jurisdiction existed because California was "the focal point of both the story and the harm suffered." *Id.* at 789, 104 S.Ct. 1482. The Court identified the following as the critical connections to California:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources and the brunt of the harm ... was suffered in California.

*Id.* at 788–89, 104 S.Ct. 1482 (footnote omitted).

We applied the effects test in *Reynolds*, where we held that the defendant's contacts were insufficient to create personal jurisdiction. 23 F.3d at 1121. *Reynolds* concerned a defamation suit arising out of a press release announcing the suspension of the plaintiff, a professional athlete, by an athletic federation for drug-testing vio-

lations. The court in *Reynolds* distinguished *Calder* on six grounds:

> First, the press release concerned Reynold's activities in Monaco, not Ohio. Second, the source of the controversial report was the drug sample taken in Monaco and the laboratory testing in France. Third, Reynolds is an international athlete whose professional reputation is not centered in Ohio. Fourth, the defendant itself did not publish or circulate the report in Ohio.... Fifth, Ohio was not the "focal point" of the press release ..... Finally, although Reynolds lost Ohio corporate endorsement contracts and appearance fees in Ohio, there is no evidence that IAAF knew of the contracts or their Ohio origin.

*Id.* at 1120.

Patterson's situation is factually closer to *Calder* than *Reynolds* in two important respects. First, plaintiff's professional reputation is centered in Tennessee. Second, Patterson was aware that her letter would potentially jeopardize plaintiff's ability to secure similar positions with his local union in Tennessee. This creates a stronger case under the effects test of *Calder* because the focal point of the damage was Tennessee, and Patterson was unquestionably aware of the potential that plaintiff would be damaged there.

In other respects, however, Patterson's connection to Tennessee is attenuated in ways similar to those we identified in *Reynolds.* First, the letter concerned plaintiff's activities in Wisconsin, not Tennessee. Second, the source of the information was the plaintiff's alleged misconduct in Wisconsin. Third, Tennessee was not the focal point of Patterson's letter. And, most significantly, there is no evidence to indicate that Patterson was involved in the decision to draft or send the Shoemaker letter, and the Shoemaker letter is the real link between defendants and the forum

state because without it there would have been no effect on plaintiff in Tennessee.

As this comparison of contacts indicates, Patterson's situation falls somewhere between *Calder* and *Reynolds.* Despite the similarities to *Calder,* we agree with the magistrate judge's determination that these contacts are not sufficient to create personal jurisdiction over Patterson because her lack of connection with the Shoemaker letter and her lack of leadership in these events make her actions less purposefully directed at the plaintiff in Tennessee than the defendant's actions in *Calder.* Patterson appears to have been following orders and her actions were not clearly intended to affect the plaintiff in Tennessee. For these reasons we affirm the district court's determination that it lacked personal jurisdiction over Patterson

### 2. *Contacts of Blaine*

■ Personal jurisdiction for Blaine is a closer question because of his role in the decision to draft and send the Shoemaker letter, as well as his role in directing Patterson to write her letter. Blaine was a member of the UAW 438 executive board, and the record indicates that his statements at the meeting played a role in the board's decision to draft the Shoemaker letter. We disagree with the magistrate judge's conclusion that Blaine's role in the decision to draft the Shoemaker letter is insufficient to establish that he took actions to direct an allegedly defamatory letter to Tennessee, because Blaine's actions were clearly intended to affect plaintiff in Tennessee.

In addition to the fact that Blaine, like Patterson, was aware that plaintiff's professional reputation was centered in Tennessee, Blaine also played an important role in the executive board's decision to send the Shoemaker letter. Defendants admit that the reason for including UAW

1853 in the distribution chain was to prevent plaintiff from being considered for similar positions with UAW 1853. Therefore, unlike Patterson who appears to have played no role at all in the Shoemaker letter, Blaine has a direct connection to a letter which defendants admit was intended to cause consequences in Tennessee.

Blaine argues that he played no direct role in drafting the Shoemaker letter and therefore has no connection with the Board's decision to send it to Tennessee. In *Calder* the Court dismissed a similar argument by the defendant that he was not responsible for the publisher's decision to publish his article in California. 465 U.S. at 789–90, 104 S.Ct. 1482. The argument for attributing some responsibility for the Shoemaker letter to Blaine is even stronger than the situation in *Calder* because Blaine initiated the process which resulted in the Shoemaker letter by directing Patterson to write her letter, and also played a role in the Board's decision to send the Shoemaker letter.

Accordingly, we disagree with the district court's decision that it lacked personal jurisdiction over Blaine. However, because we agree with the magistrate judge's conclusion that there was no publication in this case, we nevertheless affirm the district court's grant of summary judgment for defendant Blaine.

### B. Publication under Tennessee Law

■ Under Tennessee law publication is an essential element of a defamation action and, without it, a complaint must be dismissed. *See Applewhite v. Memphis State Univ.*, 495 S.W.2d 190, 192–93 (Tenn.1973); *Freeman v. Dayton Scale Co.*, 159 Tenn. 413, 19 S.W.2d 255, 256 (1929). Tennessee has adopted the rule that "where communication is made to a servant or business associate in the ordinary and natural course of business, there is no actionable libel." *Freeman*, 19 S.W.2d at 257.

The district court adopted the magistrate judge's conclusion that, under the *Freeman* rule, there was no publication in this case because communication of the letters was a necessary part of the business relationship that existed between UAW 483 and UAW 1853. The magistrate judge's conclusion was based on the reasoning of a Tennessee Court of Appeals case, *Woods v. Helmi*, 758 S.W.2d 219 (Tenn.App.1988), which extended the *Freeman* rule to communications between separate but related entities. 758 S.W.2d at 223. In *Woods*, the plaintiff, a certified nurse anesthetist, sued her supervisors and others in the anesthesiology department for alleged defamation. The plaintiff's employer staffed its anesthesiology department with both its own employees and physicians from the University of Tennessee. The plaintiff's supervisor issued a memo concerning her behavior to members of the staff with supervisory responsibilities, including several University of Tennessee physicians. The court identified the "essential" issue of *Freeman* as "the concept of 'need to know,' with the communication flowing through the proper chain of command...." *Woods*, 758 S.W.2d at 223. The court reasoned that communication of information to individuals in the need to know chain "should not be inhibited by the technical nicety that a person or persons who were in the 'need to know' channel were employed by different corporate entities." *Id.* at 224. Based on this reasoning, the court held that the defendant's communication to the outside physicians was not publication because the outside physicians received it as a necessary part of their managerial duties. *Id.* at 224.

The district court adopted the magistrate judge's conclusion that plaintiff failed to allege facts sufficient to prove that defendants published the alleged defamatory statements because the only entities to

whom they were communicated were in the "need to know" chain of command. *See Woods* 758 S.W.2d at 223 (citing *Freeman,* 19 S.W.2d at 257). We agree.

Both UAW 438 and UAW 1853 participate as subordinate entities in the larger managerial structure of UAW International. Communication concerning plaintiff's alleged misconduct was necessary to the proper functioning of this structure. This creates a situation sufficiently similar to that of *Woods* to justify applying the "need to know" rule. Accordingly, we affirm the district court's grant of summary judgment for Blaine and UAW 438.

### III.

For the reasons stated above, we affirm the district court's order granting summary judgment for all defendants.