# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3436

_____

| | | |
|---|---|---|
| Karin Gray, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| AT&T Corp., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: September 11, 2003

Filed: February 3, 2004

_____

Before WOLLMAN, BOWMAN, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Karin Gray (Gray) sued AT&T Corp. (AT&T) for making allegedly defamatory statements regarding Gray's termination. The district court[1] granted summary judgment to AT&T, concluding AT&T had not published the statements, and, alternatively, if AT&T had published the statements, the publications were qualifiedly privileged. The district court further determined Gray failed to demonstrate she

_____

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

suffered any recoverable damages. Gray appeals. Because no publication of the allegedly defamatory statements occurred, we affirm. We need not address the district court's alternative conclusions.

## I. BACKGROUND

Gray worked for AT&T as a customer account representative. From September 13, 1995, to October 18, 1995, Gray missed work due to a non-work related injury. Pursuant to AT&T's policy, Gray submitted two "Provider's Report of Non-Work Related Illness or Injury" forms (Injury Forms) to have her absences certified. Due to inconsistencies between the two Injury Forms, AT&T did not certify Gray's absences from October 9, 1995, to October 18, 1995.

Gray appealed AT&T's decision not to certify her post-October 8, 1995, absences. Pursuant to the appeal, AT&T contacted Dr. David Goldberg (Dr. Goldberg), the provider listed on Gray's Injury Forms. Dr. Goldberg informed AT&T he did not possess any records indicating his office treated Gray in September or October of 1995, and opined Gray had committed fraud. Consequently, AT&T formed an investigation team. The investigation team included Paul Garrett (Garrett), Gray's immediate supervisor; Sherry Vawter (Vawter), an AT&T corporate security manager; and Marlane Bartels (Bartels), an AT&T attendance manager.

On March 26, 1996, this team met with Gray to discuss her visits to Dr. Goldberg's office. After the meeting, Garrett and Vawter contacted Dr. Goldberg in his St. Louis office. Dr. Goldberg reiterated (1) no records existed to substantiate Gray's alleged visits; (2) the absence of any medical records supported a presumption the visits never occurred; and (3) Dr. Thomas Taylor (Dr. Taylor), the physician who allegedly treated Gray, had no authority to sign disability inquiry forms. Dr. Goldberg also informed Garrett and Vawter he would check for Gray's records in another file in his Kansas City, Missouri, office. After several unsuccessful followup attempts, Garrett asked Gray to obtain her records from Dr. Goldberg. Instead of

submitting records from Dr. Goldberg's office, Gray submitted a letter from Dr. Taylor, stating Gray visited Dr. Goldberg's Kansas City office for treatment, and Dr. Taylor treated Gray in Kansas City. Garrett informed Gray AT&T still needed records to substantiate her visits. Gray did not produce any of the requested records.

After its investigation, AT&T terminated Gray as of April 4, 1996, for falsifying corporate documents. Garrett communicated AT&T's reasons for termination to Gray; the investigation team members; Garrett's supervisor, Claudia McCarthy (McCarthy); and human resource manager, Dawn Stewart (Stewart). Garrett recorded the basis for Gray's termination in his notes and on two different forms. Melody Gilliam Rudolph (Rudolph), an AT&T human resources clerk, prepared a termination form, noting AT&T terminated Gray for "falsing [sic] records." Rudolph testified her supervisor, Stewart, most likely provided Rudolph with the information for the termination form. Rudolph also prepared an "Employee Change Notice Request" form, which contained the phrase "Dismissed–Misconduct." Following her termination, Gray filed a claim for unemployment benefits on April 8, 1996. On April 8 and April 17, 1996, AT&T forwarded via facsimile Gray's termination information to Gates McDonald & Co. (Gates McDonald), a company AT&T regularly retained to process unemployment claims.[2] The fax cover sheet

---

[2]Pursuant to a local rule, the district court deemed AT&T's Statement of Uncontested Facts as admitted, because Gray did not specifically dispute any of AT&T's Statement of Uncontested Facts. AT&T's Statement of Uncontested Facts states Gray filed her unemployment benefits claim on April 8, 1996, and AT&T provided Gates McDonald with Gray's separation information on or about April 17, 1996. However, an AT&T "Termination of Employment" form addressed to Gates McDonald, describing Gray's separation as involuntary for the misconduct of "Falsifing [sic] Records," indicates it was faxed on April 8, 1996.

accompanying the information and prepared by Rudolph stated "Karin Gray–Dismissed Falsifing [sic] Documents."[3]

Gray filed a defamation suit against AT&T, contending AT&T defamed her by publishing statements that she committed disability fraud. The district court granted summary judgment in AT&T's favor, concluding (1) AT&T had not published the allegedly defamatory statements; (2) if AT&T had published the allegedly defamatory statements, the communications were qualifiedly privileged; and (3) Gray failed to present evidence of actual damages. Gray contends otherwise.

## II.   DISCUSSION

"We review the district court's grant of summary judgment de novo." Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co., 325 F.3d 1024, 1027 (8th Cir. 2003). "We will affirm a district court's grant of summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . .' demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)). "As we exercise our power under diversity jurisdiction, we must interpret the forum state's law." Id. Under Missouri law, to establish a prima facie case for defamation, a claimant must establish six elements: "1) publication, 2) of a defamatory statement, 3) that identifies the [claimant], 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the [claimant's] reputation." Overcast v. Billings Mut. Ins. Co., 11 S.W.3d 62, 70 (Mo. 2000) (en banc).

---

[3]Right after termination, Gray told other people, including eighteen family members, two friends, and her boyfriend at the time, about her termination, and the reasons therefore.

Under Missouri law, a person publishes a defamatory statement by communicating the defamatory matter to a third person. Rice v. Hodapp, 919 S.W.2d 240, 243 (Mo. 1996) (en banc). "However, 'communications between officers of the same corporation in the due and regular course of the corporate business, or between different offices of the same corporation are not publications to third persons.'" Id. (quoting Hellesen v. Knaus Truck Lines, Inc., 370 S.W.2d 341, 344 (Mo. 1963)). "The rule rests on the premise that a corporation can only communicate through its employees [with] the writings prepared in the ordinary course of business and distributed within the corporate structure." Lovelace v. Long John Silver's, Inc., 841 S.W.2d 682, 684 (Mo. Ct. App. 1992). These intra-corporate communications made in the regular course of business do not constitute publications, because the communications are made within the corporation itself and not to a third party. Id. at 685. Missouri courts have broadly interpreted the intra-corporate immunity rule. See Blake v. May Dep't Stores Co., 882 S.W.2d 688, 691 (Mo. Ct. App. 1994) (extending the rule to a department manager with no authority to terminate, discipline or promote); Lovelace, 841 S.W.2d at 685 (concluding three employees' statements to a supervisor alleging another employee made unwanted sexual advances toward the employees fell within the intra-corporate immunity rule).

Gray contends the intra-corporate immunity rule does not apply to Vawter, Bartels, Stewart, and Rudolph.[4] We disagree. Vawter, Bartels, and Stewart were AT&T managers, and Vawter and Bartels were part of the team investigating Gray's conduct, indicating Vawter and Bartels had supervisory responsibilities. Vawter and Bartels were informed of the basis for Gray's termination during a team meeting, which occurred in the regular course of AT&T's business.

_____

[4]Earlier Gray included McCarthy as one of the recipients of a "publication." McCarthy enjoys intra-corporate immunity because Garrett was Gray's supervisor and McCarthy was Garrett's supervisor. See Blake, 882 S.W.2d at 691 (concluding a department manager's dissemination of an allegedly defamatory statement to the Director of Associate Relations enjoyed intra-corporate immunity).

-5-

Rudolph's supervisor, Stewart, also enjoys intra-corporate immunity. Stewart, as human resources manager, received and passed on the information to Rudolph in the ordinary course of business. As a human resources clerk, Rudolph must complete certain paperwork upon an employee's termination. Rudolph was required to state the basis for the termination in the paperwork. Therefore, Stewart's and Rudolph's communications were made within the scope of their duties at AT&T.[5]

Gray principally contends publication occurred when her file was transferred to Gates McDonald. This communication apparently occurred after Gray filed an unemployment benefits claim. See supra note 2. AT&T forwarded the reason for Gray's termination to Gates McDonald to process Gray's claim. Gates McDonald had a contractual duty to process and respond to Gray's unemployment claim, necessitating AT&T's disclosure of the grounds for Gray's termination.

For many years, the law of libel and slander has recognized a general exemption to the publication rule for corporate communications to necessary third parties authorized to act on behalf of the corporation. See Thornton v. Holdenville Gen. Hosp., 36 P.3d 456, 460-61 (Okla. Civ. App. 2001) (finding no publication of a hospital employee's negative statements to employees of an outside, unrelated company contractually responsible for physician staffing of the hospital's emergency room). "For a corporation . . . acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives, cannot be a publication of the libel on the part of the corporation. It is but communicating with itself." Id. at 461 (citing Magnolia Petroleum Co. v. Davidson, 148 P.2d 468, 471 (Okla. 1944) (quoting Prins v. Holland-North Am. Mortgage Co., 181 P. 680 (Wash.

_____

[5]To the extent Gray contends AT&T's placement of Garrett's notes or other forms in the corporate files or computer system constituted publication, Gray's argument is foreclosed. See Washington v. Thomas, 778 S.W.2d 792, 796 (Mo. Ct. App. 1989) (noting that placing a copy of a letter containing an allegedly defamatory statement "in the corporation's files does not constitute publication").

1919)).  At least one court has applied a "need to know" concept to the intra-corporate immunity rule.  In <u>Woods v. Helmi</u>, 758 S.W.2d 219 (Tenn. Ct. App. 1988), the plaintiff contended a publication occurred when defamatory reasons for her termination were "published" by her employer, the Regional Medical Center (Center), in a report to two physician employees of a separate entity which provided necessary physician services for patients at the Center.  In holding no publication occurred, the Tennessee Court of Appeals reasoned:

> While many of the cases denying the existence of a publication speak in terms of corporations communicating to or with itself, it seems to this Court that more essential to the issue is the concept of "need to know," with the communication flowing through the proper chain of command, particularly in employee performance reviews or disciplinary action. . . .
>
> . . .
>
>  . . . In the case at bar . . . the memorandum in question was disseminated between employees of two different corporate entities. . . .
>
> . . .
>
> . . . It was both a practical and legal necessity that they not only report any questionable practices . . . but be advised about same as well.
>
> . . . The performance of employees such as [the plaintiff] would need to be under observation at all times, and any real or suspected deviation from the appropriate standard of care should necessarily be documented and reported to those in authority. *This proper exchange of information should not be inhibited by the technical nicety that a person or persons who were in the "need to know" channel were employed by different corporate entities. The responsibilities and duties of the particular parties involved take precedent over the corporate entity that pays them their salaries.*

<u>Id.</u> at 223-24 (emphasis added). The Missouri Court of Appeals cited <u>Woods</u> and its reasoning in <u>Washington</u>, but distinguished the facts in <u>Washington</u> from <u>Woods</u>. <u>Washington</u>, 778 S.W.2d at 797-98. The reasoning and logic of <u>Thornton</u> and <u>Woods</u> are sound and consistent with business relationships today. Corporations, particularly small businesses, often rely on outside companies to perform many of their complicated regulatory compliance duties, imposed by a host of laws and regulations. We believe Missouri would apply a similar "need to know" concept for communications between the separate corporations under the facts of Gray's claim.[6]

## III. CONCLUSION

AT&T's communications of allegedly defamatory statements occurred in the regular course of its business, among persons having a need to know in order to perform their employment duties. No publication, as recognized by Missouri law, occurred. We affirm for the reasons stated.

_____

---

[6]The record clearly demonstrates AT&T did not communicate the allegedly defamatory statements with reckless disregard for the truth or falsity of the statements. AT&T conducted a reasonable investigation into Gray's conduct, and AT&T's dissemination of information did not exceed the exigencies of the situation.