# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 17, 2017 Session

## JERRETTA CERTAIN v. JUDY GOODWIN

**Appeal from the Circuit Court for Rutherford County**
**No. 68401     Howard W. Wilson, Chancellor**

_____

### No. M2016-00889-COA-R3-CV

_____

On February 6, 2014, defendant Judy Goodwin, principal of Barfield Elementary School, received an anonymous telephone call. The caller said she was a nurse and the grandparent of a child that she had just picked up at the school. The caller reported that she had seen a teacher, as it turned out, plaintiff Jerretta Certain, who appeared to the caller to be in an altered state. The caller said Ms. Certain was putting children in danger. Principal Goodwin decided to investigate the caller's claim. She asked Ms. Certain, school nurse Jessica Floyd, and Student Resource Officer Ward Bates, to come to Ms. Certain's classroom. All three observed Ms. Certain. Generally speaking, each considered her to be in an altered state. They described her as appearing drowsy, slow, and walking with difficulty. They discovered in her bags seven bottles of medications, all prescribed for Ms. Certain, in properly-marked childproof containers. Ms. Certain alleges that Principal Goodwin stated, "I believe what we're looking at is an addiction to prescription drugs." The principal asked Nurse Floyd, "would you want your child in her classroom next year knowing that she's addicted to prescriptions like this?" Ms. Certain brought this action against Principal Goodwin for defamation, invasion of privacy, and intentional infliction of emotional distress. The trial court granted Principal Goodwin summary judgment on all claims, holding as a matter of law that Ms. Certain could not establish the following essential elements: (1) actual malice; (2) that the alleged statements were defamatory; and (3) that the statements were published. Ms. Certain appeals. As modified, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; As Modified, the Judgment of the Circuit Court is Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J.,W.S, and BRANDON O. GIBSON, J., joined.

1

R. Steven Waldron, Murfreesboro, Tennessee, for the appellant, Jerretta Certain.

Josh A. McCreary, Murfreesboro, Tennessee, for the appellee, Judy Goodwin.

**I.**

The events giving rise to this lawsuit occurred at the school after the school day was over. Ms. Certain suffers from health conditions including spinal stenosis, spurs on her spine and feet, degenerative disc disease, neuropathy, carpal tunnel, brachial neuritis, fibromyalgia, arthritis, and neuromas on both feet. On the day in question, she was assigned to car duty, which means she was responsible for overseeing the children as they lined up and left the school premises for the day. Ms. Certain testified that she had taken various prescription medicines either before or during school, including Gabapentin (a nerve pain medication), Mobic (non-steroid anti-inflammatory), Armour Thyroid (for hyperthyroidism), and Zanaflex (muscle relaxer). She said she took one-half of an alprazolam (generic of Xanax, an anti-anxiety medicine) and a muscle relaxer at lunchtime. She took an additional one-half of a muscle relaxer tablet during her planning period, after lunch. Ms. Certain also testified that she suffers from insomnia and had not slept in the two days prior to this school day.

Ms. Certain was outside for car duty. It was very cold, and she was having "pretty severe spasms" in her back and neck. She leaned against a pole or column, trying to stretch out her back muscles. Shortly thereafter, the anonymous phone call was made to the school. The caller said it was "a matter of life and death." Principal Goodwin twice asked for the caller's name, but she refused to provide it. According to Principal Goodwin's deposition testimony, the caller

> said that, I'm a grandparent. I just picked up my grandchild. She didn't identify sex. I have just picked up my grandchild from the green car rider line, and I believe that there is a teacher who is putting children in danger. She said, [s]he is leaned up against the post, her eyes are half closed, and she's unsteady on her feet. And I know who she is. It's Ms. Certain.

As she made her way to where Ms. Certain was engaged in car duty, Principal Goodwin encountered Nurse Floyd, and then Officer Bates, and asked them to accompany her. When they got to Ms. Certain, Principal Goodwin instructed her to come with them to Ms. Certain's classroom.

2

Goodwin, Floyd, and Bates each testified that they observed Ms. Certain to be in what they described as an "altered state." Nurse Floyd said that Ms. Certain

> couldn't keep her eyes open. She was slow to answer the questions. She had a very flat affect. She couldn't walk in a straight line coming down the hallway back to the classroom.

Officer Bates testified by deposition as follows:

> [Ms. Certain's] eyes appeared to be half shut, I guess would be the best way to describe it. She was slow in making some statements. Like if you asked her a question, she was slow to come up with a response to the question.
>
> And then I noticed – as I followed behind, as we were headed back to where Ms. Goodwin was taking Ms. Certain, which ended up being [Ms. Certain's] classroom, I just noticed that she seemed at times to struggle to walk down the hallway.

When they got to the classroom, Nurse Floyd asked Ms. Certain to check her blood sugar levels, which she did. They were within a normal range. Ms. Certain testified that Principal Goodwin directed her to get her purse, and she complied. According to Ms. Certain, Principal Goodwin began to examine the purse's contents, pulled out her bottles of medication, and asked Nurse Floyd to write down the name of each one.

Ms. Certain stated that she additionally had prescription bottles of Opana, an opioid pain medication, and Adderall, an ADHD medication. It is undisputed that they found at least seven bottles of prescribed medications. Ms. Certain testified that she objected to the examination of her purse. She also had another bag, referred to as her teacher's bag. She said that Principal Goodwin asked to see it, but did not search it. Regarding the allegedly slanderous statements, Ms. Certain testified as follows in pertinent part:

> Q. What I wrote down is you said that Ms. Goodwin said, "I believe what we are looking at is an addiction to prescription drugs." Is that what you said?
>
> A. Yes.

3

Q. And your testimony is that's a quote. That's verbatim what she said.

A. It may not be verbatim.

Q. Okay.

A. She may have said --

Q. It's very similar to that?

A. Very, very similar to that.

\* \* \*

Q. Okay. Then what did Ms. Goodwin say?

A. She said that she felt that we were dealing with an addiction to prescription drugs.

Q. She felt that. Is that what she said, "I feel that we are dealing with" – what did she say?

A. No. She said, "It looks like we're dealing with an addiction to prescription drugs." And then she looked at Nurse Floyd and she said, "Would you want your child in her classroom next year knowing that she's addicted to prescriptions like this?" And Nurse Floyd responded, "Absolutely not."

Principal Goodwin and Nurse Floyd testified that what Goodwin asked was, "is it possible that we have an addiction problem here?" Ms. Certain became upset and called her husband to come get her. She told him on the phone that she had just been accused of being a drug addict.

Ultimately, Ms. Certain received no disciplinary action from the occurrences of that day. She immediately went on medical leave, and at the time of her deposition, April 7, 2015, had continually remained on such leave. Ms. Certain filed her "amended complaint" against Principal Goodwin on February 25, 2015.[1] Following discovery,

---

[1] Curiously, the first pleading in the record is styled "amended complaint." The trial

Principal Goodwin filed a motion for summary judgment. The trial court granted the motion, holding, as regards the defamation claim, that: (1) "from the undisputed facts presented that the Plaintiff is without the necessary ability to demonstrate with 'convincing clarity' the facts that make up actual malice"; (2) "Plaintiff cannot show the statements uttered by Ms. Goodwin were defamatory in nature"; (3) "the alleged statement at the heart of Plaintiff's claim was not the subject of 'publication' as the term is used in the context of defamation," and (4) "[t]he facts of this case show that the common interest privilege may be invoked to cover the statements at issue." The trial court further held:

> Ms. Certain's claim for invasion of privacy fails most obviously because she openly admitted to being an active participant in Ms. Goodwin taking control of the purse. Not only did Ms. Certain bring the purse to Ms. Goodwin without objection, she did not try to take it back once prescriptions began being removed. Further, Ms. Certain was a participant in the process of removing the medicine bottles. Although it is clear from the deposition testimony of Ms. Certain that she claims to have told Ms. Goodwin that her purse was private and that Ms. Goodwin did not "need to be in there," it is also clear that she made no attempt to protect her privacy by remaining in control of the purse or by standing up, taking her property, and leaving the room.

Regarding the claim of intentional infliction of emotional distress, the trial court held that "the circumstances in which the meeting and alleged statements took place indicate that a reasonable member of civilized society would not recognize the alleged statements as being outrageous" and that "a mere opinion and cursory investigation of Ms. Certain's prescription drug [use] within the contest of such exigency simply does not rise to the level of conduct required to establish IIED claims under Tennessee law." Ms. Certain timely filed a notice of appeal.

## II.

Ms. Certain raises the issues of whether the trial court erred in granting Principal Goodwin summary judgment on her claims of (1) defamation; (2) invasion of privacy

court clerk's file stamp appears to have a handwritten number "25" written over the notation designating the day filed on the time stamp. Defendant Goodwin's appellate brief states that "Plaintiff filed her original [c]omplaint on August 4, 2014, and thereafter amended her [c]omplaint twice." In any event, neither party presents an issue related to the timing of the pleadings.

5

through intrusion upon seclusion; (3) invasion of privacy by publicly placing her in a false light; and (4) intentional infliction of emotional distress.

## III.

Our standard of review of a grant of summary judgment is as stated by the Supreme Court:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness.

> \* \* \*

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015) (italics in original).

In making the determination of whether summary judgment was correctly granted,

> [w]e must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008); *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox Cnty. Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed

facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

*Wells Fargo Bank, N.A. v. Lockett*, No. E2013-02186-COA-R3-CV, 2014 WL 1673745 at *2 (Tenn. Ct. App., filed Apr. 24, 2014).

## IV.

### A.

Ms. Certain's defamation claim is one for slander, a spoken defamatory statement, as distinguished from libel, which involves written statements. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994). "Slander is the speaking of base and defamatory words which tend to prejudice another in his reputation, office, trade, business, or means of livelihood." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013), quoting *Little Stores v. Isenberg*, 172 S.W.2d 13, 16 (Tenn. Ct. App. 1943) (internal quotation marks omitted). "The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." *Quality Auto Parts Co.*, 876 S.W.2d at 820; *Brown*, 428 S.W.3d at 50 ("To be actionable, the alleged defamatory statement must constitute a serious threat to the plaintiff's reputation."), quoting *Davis v. Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001) (internal quotation marks omitted).

The Supreme Court set forth the elements of a defamation claim in *Sullivan v. Baptist Mem. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999):

> To establish a prima facie case of defamation in Tennessee, the plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *See* Restatement (Second) of Torts § 580 B (1977); *Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978).

The standard for establishing liability for defamation depends on whether the plaintiff is a public figure or a private figure. If the plaintiff "is a public official or public figure," he or she must prove that a defamatory statement was made with " 'actual malice' – that is,

with knowledge that it was false or with reckless disregard of whether it was false or not." *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005), quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As we stated in *Hibdon*,

> As to a public figure, one can only be held liable if he or she knows that the statement is false and that it defames another person, or if he or she acts in reckless disregard of such matters. As to a private person, he or she may be held liable if he or she knows that the statement is false and that it defames the person, or if he or she acts in reckless disregard of these matters, or acts negligently in failing to ascertain them.

*Id.*, citing *Verran*, 569 S.W.2d at 442 (internal citation omitted). In the present case, Ms. Certain has conceded that, as a public school teacher, she is a public figure for purposes of this defamation case. *See Campbell v. Robinson*, 955 S.W.2d 609, 612 (Tenn. Ct. App. 1997).

As a public figure, Ms. Certain bears "a substantial burden to overcome," *Moman v. M.M. Corp.*, No. 02A01-9608-CV-00182, 1997 WL 167210, at *12 (Tenn. Ct. App., filed Apr. 10, 1997), of "proving by clear and convincing evidence that the Defendants' published statements were made with knowledge of the statement's falsity or with reckless disregard of its truth or falsity." *Hibdon*, 195 S.W.3d at 62; *Byrge v. Campfield*, No. E2013-01223-COA-R3-CV, 2014 WL 4391117, at *6-7 (Tenn. Ct. App., filed Sept. 8, 2014). Regarding the "clear and convincing" evidence standard,

> Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407,

8

411 (Tenn. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. App. 1981); *Brandon v. Wright,* 838 S.W.2d at 536.

*Hibdon*, 195 S.W.3d at 62-63, quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000).

We have observed that "[s]ummary judgments are particularly well-suited" for defamation and false light claims because "the determination of whether a public figure has come forward with clear and convincing evidence that the defendant was acting with actual malice" is a question of law. *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 283 (Tenn. Ct. App. 2007). As we observed in *Lewis*,

"a public figure cannot resist a . . . motion for summary judgment under Tenn. R. Civ. P. 56 by arguing that there is an issue for the jury as to malice unless he makes some showing, of the kind contemplated by the Rules, of facts from which malice may be inferred." *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d at 74. When reviewing a grant of summary judgment to a defendant in such a case, we must "determine, not whether there is material evidence in the record supporting [the plaintiff], but whether or not the record discloses clear and convincing evidence upon which a trier of fact could find actual malice." *Piper v. Mize*, No. M2002-00626-COA-R3-CV, 2003 WL 21338696, at *7 (Tenn. Ct. App. June 10, 2003).

*Id.* (brackets in original); *see also Byrge*, 2014 WL 4391117, at *6; *Shamblin v. Martinez*, No. M2010-00974-COA-R3-CV, 2011 WL 1420896, at *3 (Tenn. Ct. App., filed Apr. 13, 2011).

Returning to the facts of the present case, there is a dispute as to exactly what words were uttered by Principal Goodwin. She steadfastly asserted that what she said was "is it possible that we have an addition problem?" The 481-page transcript of her deposition reveals that she testified those were her exact words on at least seven separate occasions. Nurse Floyd agreed with Principal Goodwin's testimony. As quoted above, Ms. Certain testified that Principal Goodwin said either that she "believed," or "felt," or

"[i]t looks like we're dealing with an addiction to prescription drugs." Additionally, according to Ms. Certain's testimony, Principal Goodwin asked Nurse Floyd, "Would you want your child in her classroom next year knowing that she's addicted to prescriptions like this?" We accept Ms. Certain's allegations as true for summary judgment purposes. Having done so, however, we agree with the trial court's judgment that they do not constitute clear and convincing evidence upon which a jury could find actual malice.

We have observed that "[a]llegedly defamatory statements should be judged within the context in which they are made." **Revis v. McClean**, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000). The context in this case begins with the anonymous phone call to Principal Goodwin by an apparently concerned grandparent warning about "matters of life and death" and a danger to elementary school students presented by Ms. Certain. Principal Goodwin testified that she took this concern very seriously and immediately investigated it. As noted already, all three witnesses to Ms. Certain's behavior – Goodwin, Floyd, and Bates – testified that she appeared to be in a "altered state," having trouble speaking, walking, and keeping her eyes open. At first, they thought Ms. Certain might be having a diabetic reaction; it was undisputed that she had told them she was diabetic. But Ms. Certain later denied that she had diabetes, saying instead she was hypoglycemic, and had never taken insulin. In any event, Nurse Floyd asked her to check her blood sugar levels, and she did, in her classroom. Nurse Floyd testified that at first, Ms. Certain used the wrong end of the lancet to try to draw her blood. The sugar levels were within the normal range. Principal Goodwin testified that "[a]t that point in time there was one thing in my mind, and that is what had caused Ms. Certain to be in an altered state." She stated generally that her investigation was focused on whether Ms. Certain posed a threat to others or herself, or if she was facing a medical emergency.

Shortly after the blood sugar test, Ms. Certain admitted that she had taken half a generic Xanax and one and a half muscle relaxers during the school day. Seven prescription medications, including two different kinds of painkillers and a muscle relaxer, were found in her bags. Ms. Certain testified that Principal Goodwin said to her, "[t]his is not the first time that you have appeared to be in an altered state, and we've talked about this before," and admitted that "we had talked about my health before." Regarding the general relationship between Ms. Certain and her principal, the trial court found as follows:

> No evidence exists to show that Ms. Goodwin was motivated
> to say anything untrue about Ms. Certain. In fact, Ms.
> Certain's deposition testimony provides proof that she and
> Ms. Goodwin had a "loving relationship" and that Ms.
> Goodwin had never done anything that would make Ms.

10

Certain think she was out "to get" her. Plaintiff testified further that Ms. Goodwin was genuinely interested in her wellbeing. Clearly, no facts exist to indicate that Ms. Goodwin made the alleged statement with knowledge of actual falsity.

The evidence does not preponderate against these findings by the trial court.

Principal Goodwin argues that the alleged statements are merely ones of opinion and/or belief, and therefore not grounds for a defamation claim. As this Court stated in **Revis**,

Opinions are not automatically protected by the United States Constitution, **Milkovich v. Lorain Journal Co.**, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), but some states still hold that statements of opinion alone are not actionable. *See* 50 Am.Jur.2d *Libel and Slander* § 161. The *Restatement* (followed by the Supreme Court in **Milkovich**) position is that an opinion may be actionable if the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion. *Restatement (2d) of Torts* § 566.

31 S.W.3d at 253; s*ee also* **Moman**, 1997 WL 167210, at *5 (quoting **Milkovich** as stating there is not "a wholesale defamation exception for anything that might be labeled 'opinion' " and stating, "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard for the truth.").

Principal Goodwin, arguing in the alternative, also asserts truth as a defense to her alleged statement that "I believe what we are looking at is an addiction to prescription drugs." In other words, she denies having said it that way, but if Ms. Certain's testimony that she did is to be believed, then the statement would be true because Principal Goodwin did in fact hold such a belief at the time. To be actionable, "the damaging words must be factually false. If the words are true, or essentially true, they are not actionable even though the statement contains other inaccuracies which are not damaging." **Revis**, 31 S.W.3d at 253, quoting **Stones River Motors, Inc. v. Mid-South Publishing Co., Inc.**, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983) (internal quotation marks omitted); **Brown**, 428 S.W.3d at 50 ("only statements that are false are actionable in a defamation case; truth is, almost universally, a defense."), quoting **West v. Media**

11

***Gen. Convergence, Inc.***, 53 S.W.3d 640, 645 (Tenn. 2001) (internal quotation marks and brackets omitted).

We are of the opinion that the alleged statement, "I believe what we are looking at is an addiction to prescription drugs," is not actionable, because it is a statement of mere opinion, and if it was made, it was true, because Principal Goodwin genuinely held such a belief at the time, based on her investigation. However, the other alleged statement – "Would you want your child in her classroom next year knowing that she's addicted to prescriptions like this?" – is different. Principal Goodwin argued, and the trial court agreed, that it could not be defamatory, because it was posed as a question to Nurse Floyd. We have observed that "a defamatory statement can be couched in the form of a question." ***Secured Fin. Solutions, LLC v. Winer***, No. M2009-00885-COA-R3-CV, 2010 WL 334644, at \*3 (Tenn. Ct. App., filed Jan. 28, 2010), citing ***McCluen v. Roane Cnty. Times***, 936 S.W.2d 936, 940 (Tenn. Ct. App. 1996). The statement at issue here, although obviously a question, contains a direct assertion of fact, *i.e.*, "she's addicted to prescriptions." We believe such a statement could reasonably be construed as defamatory, and consequently do not base our decision on the ground that this alleged statement could not be considered defamatory. Accordingly, we modify the trial court's judgment to delete its reliance on the court's holding that Principal Goodwin's question could not be defamatory because it was in the form of a question.

However, assuming for summary judgment purposes that it was uttered, Ms. Certain still cannot demonstrate that it was uttered with actual malice. As the trial court observed, there is no proof in the record supporting a conclusion that Principal Goodwin made the alleged statements knowing that they were false. Nor is there a showing that she made them with a reckless disregard for whether they were true or false. In ***Moman***, we observed that

> [r]eckless conduct is not measured by whether a reasonably prudent [person] would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts show reckless disregard for truth or falsity and demonstrates actual malice.

1997 WL 167210, at \*13 (quoting ***St. Amant v. Thompson***, 390 U.S. 727, 731-33, 88 S.Ct. 1323, 1325-26, 20 L.Ed.2d 262, 267-68 (1968)); *see also* ***Lewis***, 238 S.W.3d at 301 ("This subjective standard requires a high degree of awareness of probable falsity.") (internal quotation marks and ellipses omitted). The factual circumstances in the record, examined in the light most favorable to Ms. Certain, of the anonymous caller concerned

about a "life or death" matter, the direct observations of Ms. Certain's behavior by the three testifying witnesses, the discovery of at least seven bottles of prescription medications, and Ms. Certain's admission of her use of them during the school day, all show that Ms. Certain cannot establish by clear and convincing evidence that Principal Goodwin had a high degree of awareness that her alleged statements were probably false.

Moreover, Ms. Certain cannot establish that the statements were "published" to a third party, which is "an essential element of a claim for slander." **Brown**, 428 S.W.3d at 50; **Freeman v. Dayton Scale Co.**, 19 S.W.2d 255, 256 (Tenn. 1929). In **Woods v. Helmi**, this Court, construing the **Freeman** opinion, stated:

> In **Freeman**, the . . . Supreme Court held that a communication of a defamatory matter between the agents and officers of a corporation in the ordinary course of business was not a publication.
>
> *        *        *
>
> We interpret **Freeman** and its progeny to mean that communication among agents of the same corporation made within the scope and course of their employment relative to duties performed for that corporation are not to be considered as statements communicated or publicized to third persons.

758 S.W.2d 219, 223 (Tenn. Ct. App. 1988). Our appellate courts have also recognized a qualified "common interest" or "public interest" privilege, which the trial court found applicable in this case, and which we discussed in **Pate v. Serv. Merch. Co.**, 959 S.W.2d 569, 575-76 (Tenn. Ct. App. 1996), stating:

> A conditional privilege is recognized where the interest which the defendant is seeking to vindicate or further is regarded as sufficiently important to justify some latitude for making mistakes. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 115, at 825 (5th ed.1988). The Tennessee Supreme Court authorized conditional privileges in **Southern Ice Co. v. Black**, 136 Tenn. 391, 189 S.W. 861 (1916):
>
> > Qualified privilege extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference

to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. . . . The rule announced is necessary in order that full and unrestricted communication concerning a matter in which the parties have an interest may be had. It is grounded in public policy as well as reason.

*Id*. at 401, 189 S.W. 861 (citations omitted); see also ***Price v. Sale***, 8 Tenn.C.C.A. 382, 392–3 (1918).

Conditional privileges may cover many different types of interests including a common interest and a public interest. Keeton et al., *supra*, at 826–31. The common interest privilege has been recognized in Tennessee to cover communications between employees or agents of the same business or corporation.

The common interest conditional privilege has been applied by this Court to negate the publication element of a defamation claim on several occasions. ***Id.***; ***Woods***, 758 S.W.2d at 223; ***Evans v. Amcash Mtg. Co.***, No. 01A01-9608-CV-00386, 1997 WL 431187, at *4-5 (Tenn. Ct. App., filed Aug 1, 1997); ***Perry v. Fox***, No. 01A01-9407-CV-00337, 1994 WL 715740, at *2 (Tenn. Ct. App., filed Dec. 21, 1994); ***Dickson v. Nissan Motor Mfg. Corp., U.S.A.***, 1988 WL 9805, at *7 (Tenn. Ct. App., filed Feb. 10, 1988).

In this case, all three of the county employees had a common interest in fulfilling their duty to do what they could to keep the elementary school students safe and secure. They were performing this duty in the ordinary course of the business of administering the school. Certainly, keeping school children safe is an important public interest as well. Ms. Certain argues that the privilege should not apply here because technically Officer Bates was not employed by the Rutherford County school board, but presumably by the sheriff's department. But a similar argument was made, and rejected, in ***Woods***. 758 S.W.2d at 224 (although communication was between employees of two distinct corporations, "[t]he responsibilities and duties of the particular parties involved take precedent over the corporate entity that pays them their salaries."). Although 20/20 hindsight may suggest that Officer Bates's presence was not required as the circumstances played out, Principal Goodwin held a reasonable belief at the time that safety and security interests were implicated, and properly included Officer Bates to

participate in the investigation in a generally minimal way. We affirm the trial court's judgment that the qualified common interest privilege applies under these particular circumstances.

At some point in time during the investigation, Ms. Certain's then 12 year old daughter Grace entered her classroom. It is undisputed that all conversation stopped as soon as they became aware of Grace's entrance. Ms. Certain argues that Principal Goodwin's statement referring to addiction was inadvertently overheard by Grace. She supported this allegation by filing Grace's affidavit, wherein she stated, "[m]y mother started to get up to come over to me, but when she stood up, I heard Mrs. Goodwin say: 'What you have here is an addiction to prescription drugs and I'm not going to. . . ' " We addressed overheard statements in a defamation context in *Brown v. Christian Bros. Univ.*, stating:

> as noted by the *Brown v. Mapco* Court, although allegedly defamatory statements may have been overheard by others, this fact may not constitute "publication" for purposes of the tort: "In light of the fact that all of the customers who wandered in and out of the store are unidentified, the elements of publication and damage to reputation are likely not met as well." *Brown v. Mapco Express*, 393 S.W.3d at 709; *see further Prosser and Keeton on Torts* § 112, p. 798.

428 S.W.3d at 52. It is certainly not in dispute that Principal Goodwin had no intention to say anything that would have been heard by Grace Certain. Moreover, "[i]t is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation." *Id.* at 50, quoting *Spicer v. Thompson*, No. M2002–03110–COA–R3–CV, 2004 WL 1531431, at *5 (Tenn. Ct. App., filed July 7, 2004). It is understandable that Ms. Goodwin would have felt hurt and embarrassed if her 12 year old daughter overheard the statement alleged. But the incident could not have damaged her reputation, nor could it have held her "up to public hatred, contempt or ridicule." *Id.* at 52, quoting *Stones River Motors, Inc. v. Mid–South Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983). The incident was unfortunate, but it cannot constitute an actionable claim for slander. We affirm the trial court's summary judgment on the defamation claim.

### B.

Ms. Certain argues that the trial court erred in granting summary judgment on her claims of invasion of privacy by intrusion into her seclusion. We recognized this tort as actionable in Tennessee in *Roberts v. Essex Microtel Assoc., II, L.P.*, 46 S.W.3d 205,

15

209-11 (Tenn. Ct. App. 2000).  In doing so, we quoted the Restatement (2d) of Torts § 652B (1977), stating as follows in pertinent part:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.
>
> Comment:
>
> A.  The form of invasion of privacy covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs.  It consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man.
>
> B. The invasion . . .  may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.
>
> *     *     *
>
> D. There is . . . no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object.

*Id.* at 210.  Three years later, in ***Givens v. Mullikin ex rel. McElwaney***, 75 S.W.3d 383, 411 (Tenn. 2002), the Supreme Court "agree[d] with the Court of Appeals that a plaintiff may recover damages in Tennessee for an unreasonable intrusion into his or her private affairs."

Both Principal Goodwin and Nurse Floyd testified that Ms. Certain was completely cooperative with their inquiries and requests during the roughly one hour they

were in the classroom. They said that she was anxious to show them that all her medications were properly prescribed to her. Ms. Certain admits that she agreed to get her purse and gave it to Principal Goodwin. She further testified:

> So I got my purse. And she said, "Bring it over here." And I did so. And I said, "I don't understand what's going on." And she again said she was angry. She started to – proceeded to look through my purse. And I said, "You don't need to do that. That's personal." And everything that she took out, each medication she took out, she had Nurse Floyd write it down and tell her briefly what it would do or how it would affect me. And I said, "You don't need to write that list down. That's personal information. It doesn't need to be in my file." And I asked Ms. Goodwin to stop. She didn't respond at all. She continued to do what she was doing.

Nurse Floyd testified that she destroyed the list of medications later because it was apparent that Ms. Certain was not going to be disciplined for the events of the day, and because Nurse Floyd agreed that Ms. Certain's medication information did not need to be in her employment file.[2]

As noted above, an invasion of privacy claim requires a showing of such a substantial and intentional intrusion into a plaintiff's private affairs or concerns, that an ordinary reasonable person would find it highly offensive and strongly objectionable. Application of this objective test naturally requires the examination and consideration of the context of the totality of the circumstances presented. In this case, Ms. Certain was not in "solitude or seclusion," nor was her purse. She had brought her bags to her place of employment. Although there is a disagreement about whether the purse and her teacher's bag were visible from the seats in the classroom, it is not disputed that they were accessible to the second graders in the classroom, in the sense that they were not locked up or out of reach. Principal Goodwin and Nurse Floyd testified that this accessibility of numerous prescription medications was concerning to them. It is significant that Principal Goodwin was investigating an allegation that Ms. Certain was putting the lives of children in danger. The information about what kinds of medication Ms. Goodwin possessed and had been taking was highly pertinent to this inquiry.

---

[2] Principal Goodwin testified that it was her understanding that school board attorney Angel McCloud directed Nurse Floyd to destroy the list of medications. Attorney McCloud and Nurse Floyd denied this. Ms. Certain makes much of the allegation that the school board attorney gave a directive to destroy the list, characterizing it as "spoliation of evidence." We do not find this tangential factual dispute to be pertinent to our analysis of whether summary judgment was correctly granted.

Further, although Ms. Certain says she rather mildly protested the examination of her purse, she did cooperate with the request to retrieve it and give it to Principal Goodwin, as the trial court noted.  Under the totality of the circumstances, we cannot say that a reasonable person could find Principal Goodwin's actions in searching the purse and directing Nurse Floyd to write a list of the found medications was so "highly offensive" as to support a lawsuit for invasion of privacy by intrusion into seclusion.

## C.

Next, Ms. Certain argues that the trial court erred in granting summary judgment on her claim of invasion of privacy by publicity that unreasonably placed her in a false light before the public.  The Supreme Court recognized "the separate tort of false light invasion of privacy" in *West v. Media Gen'l Convergence, Inc.*, 53 S.W.3d 640, 643 (Tenn. 2001).  In *West*, the Court stated:

> Section 652E of the *Restatement (Second) of Torts* (1977) defines the tort of false light:
>
>> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>>
>> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>>
>> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
>
> *     *     *
>
> In our view, the "actual malice" standard adequately protects First Amendment rights when the plaintiff is a public official, a public figure, or the publicity is a matter of public interest.
>
> *     *     *

18

We hold that actual malice is the appropriate standard for false light claims when the plaintiff is a public official or public figure, or when the claim is asserted by a private individual about a matter of public concern.

*West*, 53 S.W.3d at 643-44, 647. As discussed at length above, Ms. Certain cannot establish actual malice under the circumstances here. Moreover, the "publicity" element cannot be met here either; as we observed in *Brown*,

> In *Winer*, this Court held that the email failed "as a matter of law, to satisfy the 'publicity' requirement of the tort of false light invasion of privacy," because the communication was made to a single person:
>
>> 'Publicity' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.
>>
>> Thus it is not an invasion of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.
>
> *Winer*, 2010 WL 334644 at *4.

428 S.W.3d at 53; *see also* Restatement (2d) of Torts §652D, *cmt. a*. We affirm the trial court's grant of summary judgment to Principal Goodwin on Ms. Certain's false light claim.

## D.

Finally, Ms. Goodwin challenges the trial court's summary judgment on her claim for intentional infliction of emotional distress. "The elements of an intentional infliction

of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." ***Rogers v. Louisville Land Co.***, 367 S.W.3d 196, 205 (Tenn. 2012). Regarding this claim, the trial court found and held as follows, in pertinent part:

> Clearly, the circumstances in which the meeting and alleged statements took place indicate that a reasonable member of civilized society would not recognize the alleged statements as being outrageous. As a second grade teacher, Plaintiff was charged with the responsibility of ensuring the safety of school children. When Ms. Goodwin, as principal, received a call that Ms. Certain had abdicated those responsibilities and placed the lives of students in danger, an exigent situation was created that required action by Ms. Goodwin.
>
> A mere opinion and cursory investigation of Ms. Certain's prescription drug [use] within the contest of such exigency simply does not rise to the level of conduct required to establish IIED claims under Tennessee law. Because Ms. Certain was visibly impaired, Defendant Goodwin took reasonable measures to investigate the situation and insure the continued safety of elementary school children. One would expect a principal placed in Ms. Goodwin's shoes to vigorously pursue any allegation students' lives were in danger. Not only did she know that Ms. Certain had multiple health conditions, she had previously seen her in an altered state . . . . Taking action to determine the root of the problem was not only reasonable, it was something that would clearly be expected of an elementary school administrator under the laws and public policy of this State. Accordingly, the facts alleged, taken as true, do not give rise to a claim for IIED and Defendant is awarded summary judgment on Plaintiff[']s fourth and final claim.

(Footnote in original omitted.) We agree with this analysis. In short, reviewing Ms. Certain's allegations in the light most favorable to her, no reasonable trier of fact could find that Principal Goodwin's actions were outrageous and intolerable by civilized society.

## V.

As modified, the trial court's summary judgment on all of Ms. Certain's claims is affirmed. Costs on appeal are assessed to the appellant, Jerretta Certain. The case is remanded to the trial court for collection of costs assessed below.


_____
CHARLES D. SUSANO, JR., JUDGE

21